# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

WANDA MARTZ,

                    Plaintiff,

-vs-                                                                  Case No.  6:04-cv-1251-Orl-KRS

JO ANNE B. BARNHART,
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                    Defendant.
_____

## ORDER

This cause came on for consideration on the Complaint filed by Wanda Martz seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA").  Doc. No. 10.  Pursuant to the consent of the parties, this case has been assigned to me for disposition. Doc. Nos. 12, 13.

## I.      PROCEDURAL HISTORY.

In August 2001, Martz filed an application for benefits under the Federal Old Age, Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401, *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.*, (collectively the "Act") alleging that she became disabled on May 17, 1999.  R. 78-

80, 267-70.  These claims were denied initially and on reconsideration.  R. 53-54, 57-58, 274-75, 279-81.

Martz requested review of these decisions by an administrative law judge ("ALJ").  R. 59.  An ALJ held a hearing on January 21, 2003, at which Martz and a vocational expert ("VE") testified.  R. 553-97.  On January 31, 2003, the ALJ issued a decision denying Martz's claims.  R. 294-303.

Martz requested review of this decision by the Appeals Council, which vacated the ALJ's decision and remanded the case to the ALJ for further proceedings. R. 316-18.  The Appeals Council directed the ALJ to do the following:  evaluate work performed by Martz after May 17, 1999; obtain further treatment history; consider the effect of Martz's receipt of Florida worker's compensation benefits; consider Martz's residual functional capacity ("RFC");  develop additional information about Martz's past relevant work; and, if appropriate, seek supplemental evidence from a VE.  R. 317.

In the meantime, Martz filed new applications for benefits.  R. 13, 283-85, 325-27.  After these new applications had been denied, they were consolidated with the previous applications for rehearing by the ALJ. R. 13.  On October 15, 2003, the ALJ held a supplemental hearing at which Martz and a different VE testified.  R. 598-640.

On January 15, 2004, the ALJ issued a decision denying Martz's claims.  R. 10-28.  The ALJ found that Martz had not engaged in substantial gainful activity since the alleged onset of her disability, although she had been able to perform some work at least through January 2000.  R. 15.

The ALJ concluded that Martz had degenerative disc disease of the cervical and lumbar spine after three surgeries to repair herniated discs. She also had dysthymia and borderline intellectual functioning. The ALJ concluded that these were severe impairments, but that they did not meet or equal any of the impairments listed in the social security regulations. The ALJ specifically considered listing 1.04 regarding disorders of the spine. She acknowledged that Martz had herniated discs that required surgery. She also acknowledged that Martz continued "to report some chronic back and neck pain and lower extremity symptoms," although "she was able to ambulate." The ALJ concluded that "the evidence fails to demonstrate findings of the severity required to meet or equal" listing 1.04. R. 22.

The ALJ concluded that Martz's mental impairments resulted in mild restrictions in activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace, but no episodes of decompensation. The ALJ based this conclusion on Martz's work reviews, activities of daily living, opinions of Dr. Hinkeldey and Dr. Fleischmann, consulting physicians, and Martz's testimony. R. 22-23.

The ALJ found that Martz had the RFC to do the following:

> sit for 6 hours in an 8-hour workday, stand and/or walk for 2 hours in an 8-hour workday, and lift no greater than 20 pounds. She has nonexertional restrictions in that she can perform bending, turning, twisting, stooping and overhead reaching on a very limited basis. As a result of a mental impairment, the claimant has no limitations in her ability to understand, remember and carry out short, simple instructions; no limitations in her ability to interact appropriately with the public, supervisors or co-workers; slight limitations in her ability to make judgments on simple work-related decisions, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting; and moderate

limitations in her ability to understand, remember and carry out
detailed instructions.

R. 26.  In reaching this conclusion, the ALJ found that Martz's complaints of severe pain and

limitations were "not supported by the medical or other evidence,"  R.  24, and that Martz's

allegations about the severity of her limitations were "not entirely credible." R. 25.

Martz previously worked as a cook, packer/packager, service clerk and motor vehicle

dispatcher.  Based on the testimony of a VE, the ALJ concluded that Martz could perform her past

work as a service clerk and motor vehicle dispatcher with her current mental and physical RFC.

Accordingly, the ALJ concluded that Martz was not disabled.  R. 26.

Martz requested that the Appeals Council review this decision.  On June 18, 2004, the

Appeals Council denied the request.  R. 6-8.   Martz timely sought review of the Commissioner's

decision in this Court.

**II.     JURISDICTION.**

This Court has jurisdiction under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C.

§ 1383(c)(3).

**III.    STATEMENT OF FACTS.**

*A.     Martz's Testimony.*

Martz was born on April 12, 1957.  R. 559.  She attended school through the ninth or tenth

grade, and subsequently obtained her GED.  R. 560, 581, 616.  She received secretarial training

through a vocational rehabilitation program.  R. 405-17, 560-61.

She previously worked as a dispatcher for a locksmith company and a tow truck company,

in which she answered the telephone, dispatched drivers and entered information into a computer.

R. 349-50, 561.  She described this as a stressful job.  R. 561.  She also worked on the production line at a bakery stacking and moving trays.  R. 334, 348, 562.  She had also worked as a cook for a catering company and at a fast food restaurant.  R. 347, 562-63.  In March 1999, she began work as a packager at Frito Lay.  R. 351, 565.  She stopped working at this job when she was injured, but returned to the job working part-time from November 1999 through January 2000.  R. 607.

Martz received a $45,000 worker's compensation settlement in 2001.  R.  420-28, 569, 609.  She also received income in 2000 from the settlement of a discrimination claim.  R. 607.

Martz had spasms in her back radiating down her legs and into her arms.  She had difficulty lifting her hands and feet, and one foot was partially numb as a result of surgery.  R. 566.  Her hands were always swollen.  R. 567.  She had had several surgeries on her back and neck, but none of them resolved her pain.  R. 577-78.  A fourth surgery to fuse discs in her back had been recommended but she could not afford to have it performed.  R.  578, 621, 624.

 Martz described her pain as constant.  It was exacerbated by standing or sitting for too long.  R. 570.  She took medication through the day to deal with pain.  R.  566-67, 618. Martz's ability to concentrate and remember information was impaired due to pain, and further impaired when she took Vicodin.  R.  566, 582-83, 620-21.   Medication also made her tired.  R.  570.  She had difficulty sleeping.  Sleeping pills caused her to have headaches in the morning two or three times a week lasting one-half a day each.  R. 566, 573, 620.  She tried to lie down and sleep to relieve the headaches.  R. 623.

Martz estimated that she could walk for twenty to thirty minutes before her back would begin to hurt.  R.  570, 581, 620.  Then, she would need to sit for ten to fifteen minutes and stretch

before she could walk again.  R.  571.  Working at a computer for fifteen minutes caused throbbing

in her neck and resulted in a headache.  R.  623.  She estimated that she could stand for about ten

minutes, then sit for about fifteen minutes before she could stand again.  R. 571.  She could sit for

up to an hour in a comfortable chair before she experienced tightness in her back and pain in her

back and legs.  R.  572, 580, 619.  She estimated that she would need to change positions every

forty to fifty minutes.  R.  581.   She could not bend.  She could use her hands to write and pick-up

objects.  R.  571.  She did not have sufficient strength in her hands to open a jar.  R.  572.  She

estimated that she could lift five pounds.  R.  572.

Martz indicated that she had difficulty with relationships, although she had been engaged

for two years.  R. 560, 573.  She was depressed, and she had nightmares that someone was trying

to kill her.  R.  583-84.  She often stayed in her room, isolating herself from her fiancé and crying.

R.  584.  She was also irritable.  R.  586-87.  Martz was able to drive, but she found driving in

traffic to be very stressful.  R.  559-60, 587.

Martz was able to care for her personal hygiene.  She could shop for groceries and do the

laundry with the help of her fiancé.  Her fiancé cooked and did other household chores.  R.  574,

622. However, she did not participate in activities outside her house.  R. 575-76, 585.

B.      *Vocational Expert Testimony*

At the hearing after remand, the ALJ asked the VE to assume a person of Martz's age and

education with the following RFC:

> [S]edentary activity with no lifting greater than 20 pounds.  Very
> limited bending, turning, twisting, stooping, and limited overhead
> work. . . . [C]apable of understanding, remembering, and carrying
> out short, simple instructions.  Interacting appropriately with the

-6-

> public.  Interacting appropriately with supervisors, and interacting
> appropriately with co-workers . . . . [S]light limitations in the ability
> to make judgments on simple work-related decisions.  Moderate
> limitations on ability to understand, remember, and carryout detailed
> instructions.  And slight limitations in the ability to respond
> appropriately to work pressure in a usual work setting.  And respond
> appropriately to changes in a routine work setting.  And I'm defining
> slight as there's some mild limitations in the area, but the individual
> can generally function well.

R. 627-28.  The VE responded that a person with this RFC could perform Martz's past work as a service clerk or motor vehicle dispatcher.  R. 627-28.

In response to questions from Martz's attorney, the VE testified that poor social interaction skills "would affect both jobs."  R. 629.  If the hypothetical claimant had a poor ability to work independently, the VE opined that she could not perform either of the jobs.  R. 630.

The ALJ then asked the VE to assume that the claimant had low self-esteem in social situations resulting in poor social interaction skills and a tendency to react in a defensive manner.  R. 631.  With these additional limitations, the VE opined that the person could perform the job of surveillance system monitor, assembler, or polisher.  R. 630-31, 635, 637.   If the person had a poor ability to work independently, she could not perform the job of surveillance system monitor but she could work as an assembler or polisher.  R. 634-37.

Finally, the VE testified that if the claimant needed to lie down to relieve headaches, she would be unable to perform the jobs he identified.  R. 638-39.

C.      *Medical Evidence and Vocational Rehabilitation Records.*

Leticia Camacho-Mojica, a physician's assistant at Jewett Orthopaedic Clinic, examined Martz on August 20, 1998, for complaints of low back and leg pain that she experienced after

-7-

attempting to pick up a bag of dog food.  Martz reported that she also had numbness, pins and

needles, and weakness in her legs.  Martz told Camacho-Mojica that she injured her back in a

motor vehicle accident in 1995.  Upon examination, a straight-leg raising test (SLR)[1] was positive,

but she was able to walk without difficulty, her reflexes were intact, and she had no motor deficits.

Radiographs revealed some mild decreased disc height at L5-S1.  Camacho-Mojica's impression,

which was reviewed by Gregory Munson, M.D., was lower back pain with sciatica and

degenerative disc disease.  She treated Martz with pain medication.  R. 141-42.

There are two radiology reports in the record dated February and August 1998, which

reflect that Martz had a herniated disc at C6-7, R. 252, a central disc bulge at L4-5, and a central

broad-based disc herniation at L5-S1, R. 253.

On August 31, 1998, Martz was again examined by Camacho-Mojica.  Martz told

Camacho-Mojica that her leg pain was better but that she continued to experience low back pain.

Based on an MRI, Camacho-Mojica concluded that Martz had a herniated disc at L5-S1, as well as

degenerative disc disease, sciatica and low back pain.   She prescribed a course of physical

therapy.  She instructed Martz to avoid heavy lifting and bending or twisting.  R. 139.

---

[1] "'The simple straight-leg raising test [SLR] is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'" *Menezes v. Apfel*, No. CIV. 99-168-B, 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

Martz returned to Jewett in January 1999, complaining of low back pain radiating to her right buttock.  Examination by Camacho-Mojica revealed tenderness but no motor deficits.  She was treated with medication and prescribed flexion exercises.  R. 138.

On March 15, 1999, Martz again sought treatment at Jewett for low back and right buttock pain.  The record of the examination does not reflect who treated her.  Examination revealed that Martz had some mild limitation in range of motion, with a 7% impairment to the body as a whole based on the degenerative disc disease.  R. 136-37.

In May 1999, records from Sunworks Occupational Healthcare Center reflect that Martz could return to work on May 24, 1999, with restrictions of no prolonged standing or walking – defined as thirty minutes per hour, lifting no more than five pounds, and no frequent bending of the back, squatting or climbing, and another restriction that is illegible.  R. 260, 263.  A subsequent report dated June 2, 1999, indicates that Martz could return to work on June 2, 1999, with restrictions of no prolonged standing or walking – defined as fifteen minutes per hour, and lifting no more than five pounds with no postural limitations.  R. 259, 264.

Robert Roberts, M.D., examined Martz on June 15, 1999, for complaints of right leg pain resulting from an injury suffered at work on May 17, 1999.  Martz also stated that she had injured her back earlier in a motor vehicle accident.  Upon examination, Dr. Roberts found that Martz's reflexes were diminished and that she had a positive SLR test.  R. 133.  After review of an MRI scan from before the motor vehicle accident with the MRI scan taken on June 16, 1999, Dr. Roberts observed that Martz had a large herniated disc at L5/S1 that required surgery.  R. 129-31.

On June 23, 1999, Gregory Munson, M.D., a physician at Jewett, examined Martz based on her continuing complaints of low back and right buttock pain as well as leg pain. Dr. Munson concurred with Dr. Roberts' conclusion that Martz had a substantial disc herniation at L5-S1 that required surgery. Dr. Munson instructed Martz not to return to work until further notice. R. 134-35.

Donald Behrmann, M.D., Ph.D., examined Martz on June 24, 1999. Upon examination, Martz had a positive SLR test. Dr. Behrmann noted that her right ankle reflexes were absent. He concurred that an MRI showed a large disc herniation at L5-S1 with some degeneration. He also recommended surgery. R. 184-85.

Dr. Behrmann performed a right L5-S1 hemilaminectomy and microdiskectomy on Martz on July 7, 1999. R. 182-83. Following the surgery, Martz continued to have persistent pain with paresthesias and loss of sensation over her foot. R. 178. Examination revealed a positive SLR test, loss of sensation and an absent right ankle jerk. Dr. Behrmann recommended another surgery. R. 177.

On August 9, 1999, Dr. Behrmann performed another  hemilaminectomy and microdiscectomy and removed a disc fragment from Martz's back. Immediately following surgery, Martz did not have pain, paresthesias or numbness, and she walked normally. R. 143-45. On August 24, 1999, Martz told Dr. Behrmann that she was having some mild back and right leg discomfort and numbness in her right foot. Dr. Behrmann recommended physical therapy and continued to treat her with medication. R. 175.

As of September 1999, Martz continued to complain of numbness in her foot but no significant back pain.  Dr. Behrmann released her to sedentary work.  R. 172.  On October 15, 1999, Martz reported difficulty working eight hours a day.  Dr. Behrmann adjusted her work authorization to light duty work with a twenty-five pound lifting maximum, working only six hours a day.  R. 169.  On October 18, 1999, someone prepared a functional capacity assessment on behalf of Dr. Behrmann.  The document indicates that Martz could lift no more than ten pounds.  She could sit, drive, stand, climb, bend, kneel, push and pull, reach and repetitively use her hands for sixty minutes or less at a time without a break.  R. 261.  Later in the month, Dr. Behrmann observed that Martz was working reasonably well for six hours a day.  He determined that she had reached maximum medical improvement with a partial impairment rating of 11%. R. 168.

In December 1999, Martz told Dr. Behrmann that working at her packaging job was increasing problems with her back and left side.  R. 167.  On January 6, 2000, Dr. Behrmann limited Martz to permanent restrictions of no lifting greater than twenty to twenty-five pounds with limited bending, twisting, turning, stooping, and crawling.  R. 166.

In March 2000, Martz told Dr. Behrmann that she was having cramping pain on the left side of her back and buttock, with increased numbness in her right foot.  R. 165.  In June 2000, Martz reported severe back spasms and pain in her hips and thighs after pulling some weeds.  Upon examination, Dr. Behrmann confirmed some muscle spasms. R. 164. As of June 29, 2000, Martz had not experienced significant improvement.  Dr. Behrmann prescribed Vioxx, and Ambien to help Martz sleep.  R. 163.  On July 27, 2000, Martz reported that she had chronic low

back and lower extremity pain that was tolerable with use of Darvocet and Vioxx.  R. 162. Her condition remained approximately the same as of October 31, 2000.  R. 159.

Dr. Behrmann completed a functional capacity report for Martz in September 2000.  He opined that Martz had limited range of motion due to chronic low back pain.  She walked with an antalgic gait, but she did not require an assistive device.  R. 160.

In January 2001, Martz complained of neck pain and headaches along with back and hip pain.  She also had difficulty walking long distances.  R. 158.

In April 2001, Martz reported experiencing a sharp pain in her back and buttock after a fall.  Dr. Behrmann observed that she walked with an antalgic gait and had limited range of motion with a positive SLR test.  She had "an absent right ankle jerk that is old."  R. 156.  An MRI revealed moderate degenerative changes at L5-S1.  Dr. Behrmann recommended a trial of epidural steroid injections, with Vioxx and hydrocodone for break-through pain.  R. 156.  On April 13, 2001, Martz indicated that her shoulder pain was more severe and radiated to her neck and down to her wrist, with numbness and weakness.  Upon examination, Dr. Behrmann noted that Martz's reflexes were diminished and that she had some weakness in hand grasp.  An MRI revealed a C6-7 herniation.  Dr. Behrmann recommended surgery.  R. 155.

On April 16, 2001, Dr. Behrmann performed a discectomy for the herniated disc at C6-7. R. 149-51.  On May 2, 2001, Martz reported that she was having minimal to moderate pain and spasms.  R. 154.  On June 6, 2001, Dr. Behrmann wrote that Martz had complete resolution of her neck pain and radicular symptoms, but she still had chronic back pain with left hip pain.  He recommended L5-S1 fusion surgery.  R. 153.

-12-

On July 6, 2001, Dr. Behrmann recommended that Martz have permanent work restrictions of sedentary activity, no lifting greater than twenty pounds, very limited bending, turning, twisting, stooping and very limited overhead work.  R. 152.

Meanwhile, between August 14, 2000 and July 13, 2001, Martz attended a Administrative Assistant vocational training program, which she successfully completed.  R. 405, 407, 409.  Progress reports consistently reflect satisfactory to outstanding performance in the following areas: arrives on time; has a cooperative attitude; displays interest and effort; stays on task; follows instructions; and works well with others.  R. 414- 17.

On October 12, 2001, Nancy S. Hinkeldey, Ph.D., examined Martz at the request of the SSA.  Martz reported occasional problems with memory, although Dr. Hinkeldey did not observe such problems during her examination.  Martz indicated that she had no energy, wanted to sleep all of the time, and preferred to stay home rather than socialize.  Dr. Hinkeldey's impression was that Martz had a mild dysthymic disorder as well as a pain disorder.  She indicated that Martz's social functioning was marginal and that chronic pain rendered her functional ability marginal.  R. 197-200.

On September 11, 2002, Martz returned to Dr. Behrmann.  She was still having chronic back pain radiating to her legs, which pain was increased with standing and over-activity.  It appears that an SLR test was positive.  She walked with a antalgic gait and had "old sensory changes in the S1 distribution."  R. 364.  Dr. Behrmann recommended exercises, and prescribed Celebrex and hydrocodone for break-through pain. *Id.*

On February 26, 2003, Martz told Dr. Behrmann that she was having chronic neck pain with headaches as well as chronic lower back pain radiating to the right leg and foot with paresthesias and loss of sensation in the bottom of her right foot.  She had a positive SLR test, and weakness in flexion of her right foot.  She continued to have an absent right ankle jerk as compared with the left.   She also had some weakness of dorsiflexion of her right foot. Dr. Behrmann opined that the symptoms were from degenerative cervical and lumbar discs. R. 363. He treated Martz with a Decadron Dosepak and Percocet and ordered MRIs.  R. 363.  The MRIs revealed possible scar enhancement enveloping the right C8 nerve root as a result of prior surgery.  R.  362.  It also disclosed scarring with probable envelopment of the right S1 nerve root, moderate-severe neural foraminal narrowing at L5-S1, a small disc protrusion at L4-5, and mild bulging at T12-L1.  R. 360-61.

Margarita Delgado, D.O., treated Martz on May 19, 2003.  Martz complained of neck and lower back pain and tightness in her trapezius.  Dr. Delgado prescribed Percocet and Flexeril.  R. 530. On October 2, 2003, Martz requested medication to help her sleep.  R. 529.

On August 19, 2003, Dr. Behrmann recommended that Martz "receive permanent work restrictions of sedentary activity with no lifting greater than 20 pounds, very limited bending, turning, twisting, stooping and very limited overhead work . . . ."  R. 419.

On September 17, 2003, Martz began treatment at the Pain Management Center of West Orlando-Physical Therapy.  She complained of neck and lower back pain radiating to her shoulders. R. 547.  Upon examination, Carlos Jassir, M.D., noted limitations of range of motion in her neck and back.  Her motor strength in her upper extremities was normal, albeit with

slightly reduced sensation.  An SLR test was positive.    Reflexes were reduced or absent but motor functioning was normal.  Dr. Jassir's assessment was local back pain secondary to lumbar spine fusion, lumbar facet arthropathy, lumbar disc displacement and possible sensory radiculopathy.  He treated Martz with medication and physical therapy.  R. 542-46.  He subsequently administered a series of epidural steroid injections.  R. 536-41.  On October 28, 2003, Dr. Jassir wrote that Martz was doing better and had obtained significant relief through physical therapy.  R. 535.

On September 25, 2003, David J. Fleischmann, Ph.D., examined Martz at the request of the SSA.  Dr. Fleischmann observed that Martz walked with a slight limp and had an uneven gait.  Her attention and concentration were sustained throughout the evaluation, although her mood was dysthymic.  After testing, Dr. Fleischmann concluded that Martz was in the borderline range of intellectual functioning.  An MMPI-2 test revealed that Martz did not generally exaggerate the severity of her problems, although she had depleted coping skills.  The test results also reflected that Martz had mild but chronic depression.  His assessment was that she suffered from dysthymia.  R. 523-26.  In a mental functional capacity assessment, Dr. Fleischmann opined that Martz had moderate difficulties in understanding, remembering and carrying out detailed instructions.  She had slight limitations in the ability to make judgments based on simple work-related decisions, to respond appropriately to work pressures in a usual work setting, and to respond appropriately to changes in a routine work setting.  R. 527-28.

D.     *Opinions of Reviewing Physicians.*

1.     Physical Functional Capacity.

On October 9, 2001, David Z. Kitay, M.D., prepared a physical functional capacity assessment of Martz based on review of her records.  Dr. Kitay opined that Martz could occasionally lift twenty pounds and frequently lift ten pounds.  She could sit, stand or walk six hours in an eight-hour workday.  She would have occasional limitations in the ability to stoop and crouch.  R. 237-44.  On March 20, 2002, M. delaCerna, M.D., essentially agreed with Dr. Kitay's assessment, except that he found no postural limitations.  R. 229-36.

On May 21, 2003, Keith R. Holden, M.D., prepared another physical functional capacity assessment of Martz based on review of her records.  He opined that Martz could lift twenty pounds occasionally and ten pounds frequently.  She could stand or walk two to four hours a day, and sit about six hours in an eight-hour workday.  Her ability to push and pull with her legs was limited, and she could only occasionally climb, balance, stoop, kneel, crouch, and crawl.  She should also avoid concentrated exposure to hazards.  R. 366-73.

2.     Mental Functional Capacity.

On November 6, 2001, Deborah L. Carter, Ph.D., prepared a mental functional capacity assessment of Martz based on a review of her records.  Dr. Carter opined that Martz had no restrictions in activities of daily living, mild difficulties in social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation.  R. 215-28.  On March 8, 2002, Pamela D. Green, Ph.D., essentially agreed with Dr. Carter's assessment, except that she concluded that Martz had mild restrictions in activities of daily living, social functioning and

-16-

maintaining concentration, persistence and pace, with no episodes of decompensation.  R. 201-14.

## IV.    STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C).  The Act provides further that a claimant is not disabled if he is capable of performing his previous work, or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful employ which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The court's review of a final decision by the SSA is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence  even if the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## V.    ANALYSIS.

Martz raises three issues on appeal.  First, that the ALJ improperly concluded that her impairments did not meet or medically equal any of the impairments listed in the social security regulations.  Second,  that the ALJ did not properly evaluate her complaints of pain and other subjective symptoms.  Third,  that the ALJ erred in determining Martz could perform her past relevant work.  These are the only issues I will address.

### 1.    *Listing 1.04.*

Martz contends that her impairments met Listing 1.04, disorders of the spine.  20 C.F.R. Subpt. P, App. 1, 1.04. Listing 1.04 reads, in pertinent part, as follows:

> Disorders of the spine (e.g., herniated nucleus pulposus, . . ., spinal stenosis, . . ., degenerative disc disease, facet arthritis, . . .), resulting in compromise of a nerve root . . . or the spinal cord. With:

>    A.    Evidence of nerve root compression characterized by neuro-anatomic
>    distribution of pain, limitation of motion of the spine, motor loss (atrophy with
>    associated muscle weakness or muscle weakness) accompanied by sensory or
>    reflex loss and, if there is involvement of the lower back, positive straight-leg
>    raising test (sitting and supine) . . . .

20 C.F.R. § 404, Subpt. P, App. 1, 1.04.  As discussed above, the ALJ considered this listing but determined that it did not apply because Martz could walk and "the evidence fail[ed] to demonstrate findings of severity required to meet or equal" the listing.

Substantial evidence in the record supports a finding that Martz had disorders of the spine throughout the period in question.  Radiology reports showed herniated discs in her cervical and lumbosacral spine in 1998, 1999, 2001, and disc protrusion and bulging in 2003. Dr. Behrmann opined that Martz had degenerative changes in her spine after the spinal surgeries in 1999.  In 2003, Dr. Jaffir concluded that Martz had lumbar facet arthropathy, which appears to be a form of facet arthritis.  *See* Back.com, *Mechanical Disorders: Facet Arthropathy*, found online at http://www.back.com/causes-mechanical-facet.html (last visited March 1, 2006).

As for the subpart A elements of the listing, I interpret the ALJ's finding that Martz could ambulate to be a reference to the requirement that the claimant establish motor loss. Substantial evidence supports the ALJ's conclusion that Martz did not suffer motor loss. Camacho-Mojica opined after examining Martz in September 1998 that Martz had no motor deficits.  Dr. Jassir concluded that Martz's motor functioning was normal in September 2003. While the records reflect that Martz's sometimes walked with an antalgic gait or a slight limp, these findings are consistent with attempts to alleviate pain, rather than an indication of muscle weakness.

"[W]hen a claimant contends that he has an impairment . . . which is equal to one of the listed impairments, the claimant must present medical evidence which described how the impairment has such equivalency." *Bell v. Bowen*, 796 F.2d 1350, 1353 (11th Cir. 1986). The citations to the record upon which Martz relies to establish that she suffered motor loss do not support her contention.  Doc. No. 15 at 16 (citing R. 129, 133, 177, 185, 363).  The medical record dated February 26, 2003, refers to weakness of the dorsiflexion of the right foot. This single indication of muscle weakness is not substantial evidence of motor loss, particularly in light of Dr. Jassir's assessment in September 2003, that Martz had normal motor functioning. Accordingly, I conclude that the ALJ did not err in concluding that Martz's condition did not meet or equal listing 1.04.

B.      *Evaluation of Complaints of Pain and Other Subjective Symptoms.*

Martz contends that the ALJ erred by failing to credit her testimony about the functional limitations of pain and mental impairments, including decreased socialization skills.

"The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  This standard applies to other subjective symptoms, as well as pain. *See id.* at 1560.   If the Commissioner discredits the claimant's subjective testimony, she "must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62.

The ALJ correctly applied this standard.  She concluded that Martz had "degenerative disc disease and dysthymia which could reasonably cause some pain and other symptomatology."  R. 24.  She found, however, that the claimant's allegations about the severity of the pain and other subjective symptoms were not supported by medical or other evidence.  She articulated the following reasons supporting this conclusion:

1.      With respect to right upper extremity pain, the evidence showed that surgery resolved the problems and Martz had no further complaints of such pain.  R. 24.  Substantial evidence supports this conclusion.  Martz complained of shoulder and right extremity pain in April 2001 as a result of a fall.  After Dr. Behrmann performed a discectomy for the herniated disc at C6-7, he wrote that Martz had complete resolution of her neck pain and radicular symptoms.  While she later complained of trapezius tightness and shoulder pain, after examination in September 2003, Dr. Jassir determined that she had normal motor function in her upper extremities.

2.      Regarding her back pain, the ALJ relied upon the following to support her conclusion that the pain was not as limiting as Martz's represented it to be: medication and steroid injections controlled the pain; Martz participated in physical therapy and reported significant improvement; Martz did not manifest severe pain through poor overall health, weight loss or muscle wasting or atrophy; except for two instances, Martz had not required hospitalization due to severe pain; Martz had not sought emergency medical treatment for complaints of pain; and that there were prolonged periods when Martz did not seek any medical treatment.  R. 24.

-21-

Martz correctly contends that she presented evidence that she could not always seek medical treatment due to lack of insurance and money.  She also accurately contends that she did seek emergency room treatment for pain.  Even if these two reasons supporting the ALJ's conclusion regarding the severity of Martz's back pain are disregarded, the remaining reasons, which are supported by substantial evidence, are sufficient to satisfy the requirement that the ALJ articulate specific reasons supporting her determination that Martz was not entirely credible regarding the limitations arising from her back pain.

3.      With respect to limitations arising from dysthymia, the ALJ noted that Martz was able to complete a vocational rehabilitation program for which she consistently received positive ratings in staying on task, following instructions, and working well with others.  She was also able to work part-time from October 1999 through January 2000.  She was able to engage in activities of daily living.  These findings are supported by substantial evidence in the record, as discussed in the Statement of Facts above.

In sum, the ALJ applied the pain standard applicable in this circuit, and she articulated explicit and adequate reasons supporting her decision about the functional limitations arising from pain and other subjective symptoms.  As such, she did not err in her assessment of Martz's credibility.

C.      *Ability to Perform Past Relevant Work.*

Martz argues that the ALJ erred in several respects in reaching the conclusion that she could return to her past relevant work.  Initially, Martz asserts that the ALJ's RFC assessment

was incorrect because she did not properly assess the functional limitations arising from pain. This issue was discussed previously and will not be repeated here.

Martz also contends that the ALJ should not have relied on Dr. Behrmann's opinion that she could perform sedentary work because Dr. Behrmann did not define that term.  Reviewing the record as a whole, however, reveals that Dr. Behrmann was familiar with the terms of art used to describe exertional capacity to work. *See, e.g.,* R. 166, 169, 172.  There is no reason to believe that Dr. Behrmann's definition of sedentary work differed from that used in the social security regulations.

Martz also submits that the ALJ erred by stating that she adopted the opinion of Dr. Fleischmann, but failing to credit Dr. Fleischmann's statement that Martz had low self esteem and poor socialization skills.  I note, however, that in his functional capacity assessment, Dr. Fleischmann opined that Martz had no limitations in her ability to interact appropriately with the public, supervisors and coworkers.    Accordingly, substantial evidence supported the ALJ conclusion that Martz had no limitations in her ability to interact with others.

Finally, Martz urges that the ALJ erred by delegating the responsibility to determine whether Martz could perform her past relevant work to a VE.  The services of a VE may be used at step four of the social security disability evaluation. *See* 20 C.F.R. § 404.1560(b)(2).  As such, the ALJ did not err by relying upon the opinion of the vocational expert, along with all of the other findings the ALJ made regarding Martz's RFC, to conclude that Martz could perform some of her past relevant work.

**VI.    CONCLUSION.**

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED.**  The Clerk

of Court is directed to issue a judgment affirming the decision of the Commissioner of Social

Security and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 7, 2006.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties